UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CARA E. TUSKEY,<br><br>                            Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>                            Defendant. | Case No. 21-cv-10157<br>Honorable Laurie J. Michelson<br>Magistrate Judge Elizabeth A. Stafford |

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT (ECF NOS. 17, 19)**

## I.    Introduction

Plaintiff Cara E. Tuskey appeals a final decision of defendant Commissioner of Social Security (Commissioner) denying her application for supplemental security income (SSI) under the Social Security Act.  Both parties have filed summary judgment motions, referred to this Court for a report and recommendation under 28 U.S.C. § 636(b)(1)(B).  After review of the record, the Court **RECOMMENDS** that:

- Tuskey's motion (ECF No. 17) be **DENIED**;

- the Commissioner's motion (ECF No. 19) be **GRANTED**; and

- the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C.

  § 405(g).

## II.    Background

### A.  Tuskey's Background and Disability Application

Born in July 1993, Tuskey was 24 years old at the time of her

application.  ECF No. 15-2, PageID.82.  Tuskey had no past relevant work.

*Id.*  She claimed to be disabled from gastroparesis, chronic migraines, low

blood pressure, tachycardia, sleep apnea, and autoimmune disease.  ECF

No. 15-3, PageID.107-108.

After the Commissioner denied her disability application initially,

Tuskey requested a hearing, which took place in May 2018.  ECF No. 15-2,

PageID.73.  Tuskey and a vocational expert (VE) testified at the hearing.

*Id.*  In the decision that followed, the ALJ found Tuskey not disabled.  *Id.* at

PageID.83.  The Appeals Council denied review, and the ALJ's decision

became the final decision of the Commissioner.  *Id.* at PageID.62.  Tuskey

timely filed for judicial review.  ECF No. 1.

### B. The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or

2

can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps. First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled. 20 C.F.R. § 416.920(a)(4). Second, if the claimant has not had a severe impairment or a combination of such impairments for a continuous period of at least 12 months, no disability will be found. *Id.* Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.* If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity (RFC), and will find the claimant not disabled if he or she can still do past relevant work. *Id.* At the final step, the Commissioner reviews the claimant's RFC, age, education, and work experiences, and determines whether the claimant could adjust to other work. *Id.* The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if

the fifth step is reached.  *Preslar v. Sec'y of Health & Human Servs.*, 14

F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Tuskey was not

disabled.  At the first step, he found that she had not engaged in substantial

gainful activity since the application date.  ECF No. 15-2, PageID.75.  At

the second step, the ALJ found that Tuskey had the severe impairments of

migraine headaches, sleep apnea, hypotension, tachycardia, autonomic

dysfunction, and gastroparesis.  *Id.*  Next, the ALJ concluded that none of

her impairments, either alone or in combination, met or medically equaled

the severity of a listed impairment.  *Id.* at PageID.75-76.

Between the third and fourth steps, the ALJ found that Tuskey had

the RFC "to perform light work as defined in 20 CFR 416.967(b) except that

she cannot climb ladders, ropes, or scaffolds; can occasionally perform

other postural activities; cannot work with concentrated extreme

temperatures, pulmonary irritants, or hazards, such as moving machinery."

*Id.* at PageID.76.  At step four, the ALJ found that Tuskey had no past

relevant work.  *Id.* at PageID.82.  At the final step, after considering

Tuskey's age, education, work experience, RFC, and the testimony of the

VE, the ALJ also concluded that she could perform jobs that existed in

significant numbers in the national economy, including office cleaner,

4

assembler, and packager.  *Id.*  The ALJ thus concluded Tuskey was not

disabled.  *Id.* at PageID.83.

### III.    Analysis

### A.

Under § 405(g), this Court's review is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was

made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc.*

*Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).

> Under the substantial-evidence standard, a court looks to an
> existing administrative record and asks whether it contains
> sufficient evidence to support the agency's factual
> determinations.  And whatever the meaning of substantial in
> other contexts, the threshold for such evidentiary sufficiency is
> not high.  Substantial evidence, this Court has said, is more
> than a mere scintilla.  It means—and means only—such
> relevant evidence as a reasonable mind might accept as
> adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks

omitted).

Tuskey argues that the Court must remand this matter because the

ALJ failed to show there was a significant number of jobs in the national

economy that she could perform.  ECF No. 17, PageID.1596-1598.  She

also argues that the ALJ failed to ask the VE a hypothetical question that

would account for her work absences and inability to remain on-task.  *Id.* at

PageID.1598-1601.  The Court disagrees and recommends the ALJ's decision be affirmed.

## B.

Tuskey argues that the ALJ failed to show there were a significant number of jobs in the national economy that she could perform.  Because the ALJ found that Tuskey had no past relevant work, the Commissioner had the burden of showing that she could perform other work "which exists in the national economy."  *See* 42 U.S.C. § 423(d)(2)(A).  "[W]ork which exists in the national economy" is defined as "work which exists in significant numbers *either in the region where such individual lives or in several regions of the country*."  *Id.* (emphasis added).  Although the Commissioner need not show that work exists in the claimant's "immediate area," benefits will not be denied based on "[i]solated jobs that exist only in very limited numbers in relatively few locations."  20 C.F.R. § 416.966(a)-(b).

At the hearing, the ALJ posed a hypothetical matching the RFC and asked if there were jobs in the national economy a person with those limitations could perform.  ECF No. 15-2, PageID.102.  The VE responded that an individual with those limitations could perform the work of an office cleaner (200,000 jobs nationally), assembler (150,000 jobs), and packager

(200,000 jobs).  *Id.* at PageID.102-103.  Based on that testimony, the ALJ found Tuskey not disabled.

Tuskey argues that the record establishes only that these jobs exist nationally but not that they exist in Tuskey's region or in several other regions.  The Sixth Circuit recently rejected this argument: "[T]his court's cases have consistently found evidence of the jobs available nationally to be sufficient to carry the Commissioner's burden, without requiring testimony that specifies particular regions in which those jobs are available."  *Wood v. Comm'r of Soc. Sec.*, No. 19-1560, 2020 WL 618536, at *6 (6th Cir. Jan. 31, 2020).  Thus, VE testimony that 467,000 jobs existed in the national economy was enough for the Commissioner to carry its burden.  *Id.*

*Wood* comports with the Sixth Circuit's earlier rejection of a plaintiff's argument that she lived 70 miles from the area with the available jobs.  *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999).  The court in *Harmon* noted that Social Security regulations "make it clear that the test is whether work exists in the national economy, not in plaintiff's neighborhood," and concluded that "700,000 jobs, with no indication of gross concentration in a few areas, is a 'significant number of jobs in the national economy.'"  *Id.*

Some courts have remanded when an ALJ failed to cite regional data or consider other case-specific factors in finding that a significant number of jobs exists that the plaintiff can perform. *See, e.g.*, *Isaac v. Saul*, No. 2:20-cv-11573, 2021 WL 4770122, at *8 (E.D. Mich. Apr. 29, 2021); *Porter v. Berryhill*, No. 5:17-CV-05028-VLD, 2018 WL 2138661, at *64 (D.S.D. May 9, 2018). But *Isaac* involved a small number of jobs available in the national economy. *See* 2021 WL 4770122, at *8 ("There is little support for the contention that 8,784 total jobs in the national economy is a significant number."). And as a later opinion clarifies, the court that decided *Porter* declined to take a "leap of faith" about the availability of jobs in South Dakota's lightly-populated, job-sparse market. *Heather R. v. Saul*, No. 4:20-CV-04082-VLD, 2021 WL 3080331, at *25 (D.S.D. July 21, 2021).

The Court follows the Sixth Circuit's reasoning in *Wood*. The VE testified that 550,000 jobs exist in the national economy that Tuskey can perform. Given the large number of jobs and southeastern Michigan's reasonably robust job market, the Court finds that the Commissioner has carried her burden of showing that Tuskey can perform work that exists in the national economy.

**C.**

Tuskey next contends that the hypothetical posed to the VE did not account for the frequent absences and inability to remain on-task that her pain and fatigue would cause.  The regulations set forth a two-step process for evaluating a plaintiff's subjective symptoms, including complaints of pain.  First, the ALJ evaluates whether objective medical evidence of an underlying condition exists and whether that condition could reasonably be expected to produce the alleged pain.  20 C.F.R. § 416.929(a); SSR 16-3p. If so, the ALJ assesses any work-related limitations by determining the intensity, persistence, and limiting effects of these symptoms.  20 C.F.R. § 416.929(a); SSR 16-3p.  In sum, ALJs assess whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record."  SSR 16-3p.

To evaluate the limiting effects of subjective symptoms, ALJs consider all available evidence, including the plaintiff's history, laboratory findings, statements by the plaintiff, and medical opinions.  20 C.F.R. § 416.929(a).  Although a plaintiff's description of her symptoms will "not alone establish that [she] is disabled," *id.*, the ALJ may not disregard the plaintiff's subjective complaints because they lack substantiating objective evidence, SSR 16-3p.  Without objective evidence, ALJs are to consider a

9

plaintiff's daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, and side effects of medication to alleviate symptoms; and any other treatment or measures used to relieve pain.  20 C.F.R. § 416.929(c)(3).

Tuskey stated in a function report that her low blood pressure and migraines cause fatigue and difficulty concentrating—symptoms that led her to withdraw from college.  ECF No. 15-6, PageID.234, 238-239, 241; ECF No. 15-2, PageID.95.  She testified during the administrative hearing that she lacks the energy to complete many activities.  ECF No. 15-2, PageID.93.  Although Tuskey sleeps eight to 12 hours per night, she sometimes needs a daytime nap if she has a migraine.  *Id.*  She said she gets severe migraines at least twice a week and has minor headaches throughout the week.  *Id.*  And because of "brain fog" that causes confusion and lack of focus, Tuskey estimated that she would be off-task for 60% of a normal workday.  *Id.* at PageID.96.

The ALJ considered Tuskey's subjective complaints but found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  ECF No. 15-2, PageID.77.  During a summary of Tuskey's medical history, the ALJ emphasized that her clinical

examinations were often normal and that her physicians recommended conservative measures such as medication and adjusting her diet.  *Id.* at PageID.78-80.  While imaging revealed that Tuskey's gastric emptying was delayed and that she had moderate stool burden, most other testing was normal.  *Id.* at PageID.79-80.  The ALJ also noted that treatments were effective.  For example, Botox injections reduced the frequency of migraines, which ranged from four or five headaches in three months to three or four severe headaches per month.  *Id.* at PageID.78-80.  And although Tuskey was diagnosed with mild obstructive sleep apnea and sleep disturbance, she reported feeling more energetic after she began using a CPAP machine.  *Id.*

Substantial evidence supports the ALJ's conclusions.  In March 2016, Tuskey presented with low blood pressure and a high heart rate, which caused her to feel lightheaded and dizzy with near-syncopal episodes.  ECF No. 15-8, PageID.355.  She also complained of headaches.  *Id.*  A blood panel yielded normal results.  *Id.* at PageID.358-359.  Tuskey saw a cardiologist, who found no abnormalities on physical examination and noted that an echocardiogram from 2011 showed normal heart structure and function.  *Id.* at PageID.361-364.  Another cardiologist noted that a Holter monitor showed sinus tachycardia, but he attributed this condition to

11

Tuskey's gastroparesis with ongoing malnutrition and dehydration.  ECF No. 15-7, PageID.342.  Rather than prescribe medication, he recommended that Tuskey manage her weight and diet.  *Id.*

Tuskey's tachycardia remained stable and responsive to conservative treatment.  In February 2017, Tuskey complained of general fatigue, but her cardiologist recommended conservative measures such as drinking more water and wearing compression stockings.  ECF No. 15-12, PageID.1004-1007.  And although Tuskey's blood pressure was often low, it became more stable over time.  *See, e.g.*, ECF No. 15-12, PageID.1070 (110/58); ECF No. 15-13, PageID.1198 (120/68); ECF No. 15-14, PageID.1391 (116/77); ECF No. 15-15, PageID.1548 (111/69); ECF No. 15-15, PageID.1578 (121/84).  Notably, the record reflects no regular complaints of light-headedness.

Tuskey saw a neurologist in July 2016 for chronic migraines and fatigue, gastroparesis, and orthostatic hypotension.  ECF No. 15-8, PageID.371.  The neurologist observed that Tuskey had symptoms that "far exceed what is typically expected from a migraine patient," while a neurologic exam, EMG testing, autonomic studies, and paraneoplastic antibody testing were normal.  *Id.* at PageID.371, 374.  Tuskey reported having headaches 15 to 20 days per month, with more severe migraines

12

twice a week.  *Id.* at PageID.371.  She was referred to a neuromuscular specialist and for Botox injections to treat her migraines.  *Id.* at PageID.375.

With treatment, Tuskey's migraines were well controlled.  After starting Botox injections, Tuskey reported in January 2017 that she was "very happy with the results"—she had two to three migraines over three months, with one that was severe.  *Id.* at PageID.431.  In April and July 2017, she felt the benefit from Botox had decreased, as she experienced two to three non-severe headaches per week.  ECF No. 15-7, PageID.350; ECF No. 15-8, PageID.453.  Tuskey's doctor increased the dosage, which helped reduce symptoms through May 2018 to one or two mild headaches per week and one or two severe headaches per month.  ECF No. 15-9, PageID.556; ECF No. 15-12, PageID.1061; ECF No. 15-13, PageID.1190. When she had a severe headache, Naproxen offered some relief.  ECF No. 15-9, PageID.556; ECF No. 15-12, PageID.1061.

In June 2018 through February 2019, Tuskey reported having ten headaches per month, with three or four being severe.  ECF No. 15-13, PageID.1163, 1202, 1226; ECF No. 15-15, PageID.1542.  During this time, Tuskey's doctor noted her migraines were "well controlled" with Botox, while Tuskey confirmed that Botox gave her "good relief."  ECF No. 15-14, PageID.1432; ECF No. 15-15, PageID.1542.  In May 2019, Tuskey

13

reported minimal headaches and a few weeks with no headaches at all. ECF No. 15-15, PageID.1555.  But in September 2019, Tuskey said she had frequent, prolonged headaches because of the summer heat.  *Id.* at PageID.1571, 1576.  Her doctor planned to discontinue Botox and begin antibody therapy, but no medical records document the new treatment's effectiveness.  *Id.* at PageID.1576.

In August 2016, Tuskey complained of nausea and abdominal discomfort caused by gastroparesis and constipation—conditions suspected to be related to autonomic neuropathy.  ECF No. 15-8, PageID.381.  Her doctor noted a 2011 study showing significant delays in Tuskey's gastric emptying.  *Id.*  The doctor noted no abnormalities on physical examination but prescribed a low dose of Reglan to treat her nausea.  *Id.* at PageID.381-382.  Treatment notes from September 2016 show that Tuskey's gastroparesis was "well controlled" by following a special diet.  *Id.* at PageID.394.  And although Tuskey experienced intermittent nausea, it was controlled with medication.  *Id.*  A physical examination was normal, and the doctor recommended lifestyle modifications such as eating small meals throughout the day.  *Id.* at PageID.398-399.

Tuskey's gastroparesis and constipation appear well controlled with conservative treatment.  In December 2016, Tuskey was doing "remarkably well" and was responding well to conservative measures.  *Id.* at PageID.417.  Although she reported some abdominal pain in June 2017, her constipation and other symptoms were well managed with conservative diet and lifestyle modifications.  ECF No. 15-7, PageID.332, 336.  The doctor made a similar observation in March 2018.  ECF No. 15-9, PageID.577.  A consulting specialist at Mayo Clinic noted in June 2018 that Tuskey's gastric emptying was delayed and that she suffered from significant constipation, but he recommended conservative measures such as Miralax and glycerin suppositories.   ECF No. 15-13, PageID.1162.  Tuskey began treating her gastroparesis with Solu-Medrol in October 2018, *id.* at PageID.1224, and her doctor believed her symptoms improved, ECF No. 15-15, PageID.1508.  In April 2019, Tuskey confirmed she was feeling better on Solu-Medrol, and her doctor noted that her symptoms were stable.  ECF No. 15-15, PageID.1545.  A study showed that Tuskey's gastric emptying was normal at four hours, the most accurate time to measure.  *Id.* at PageID.1550.

Tuskey was diagnosed with hypersomnia and delayed phase sleep disorder in November 2016, when she complained of excessive sleepiness

15

and an irregular sleep pattern.  ECF No. 15-12, PageID.965, 970.  Tuskey

reported that she typically goes to bed between 11:00 p.m. and midnight

but does not fall asleep until 6:00 a.m., waking up between 11:00 a.m. and

noon.  *Id.* at PageID.965.  Because of her fatigue, she took daytime naps

lasting one to four hours.  *Id.*  Her doctor ordered two sleep studies,

directed Tuskey to keep a sleep diary, and discussed behavioral

modifications.  *Id.* at PageID.970.  Testing showed that Tuskey has mild

obstructive sleep apnea, and she was prescribed a CPAP machine.  ECF

No. 15-8, PageID.429.

Tuskey's sleep disorders were controlled with a CPAP machine, light

therapy, melatonin, and behavior modifications.  After she began to use a

CPAP machine in March 2017, she consistently reported feeling more

energetic.  ECF No. 15-7, PageID.332; ECF No. 15-9, PageID.503, 515;

ECF No. 15-13, PageID.1187; ECF No. 15-15, PageID.1558.  Tuskey's

sleep pattern also became more regular and continued to improve over

time.  ECF No. 15-9, PageID.515; ECF No. 15-12, PageID.1031.  By May

2018, her doctor reported that her delayed sleep phase syndrome had

resolved and was controlled with melatonin.  ECF No. 15-13, PageID.1187-

1188.

None of Tuskey's treating doctors stated that her impairments would cause her to miss work or be off-task.  Her primary care doctor, Eileen Kuet, M.D., found that Tuskey's impairments "affect her daily life" and that "her symptoms continue to persist on a regular basis and are likely to remain chronic conditions."  ECF No. 15-15, PageID.1574.  But as the ALJ noted, these statements are vague and fail to specify how Tuskey's symptoms would limit her ability to work.  *See* ECF No. 15-2, PageID.81.  Nor did consultative examiner Leonidas Rojas, M.D., or the state agency's reviewing physicians Sonia Ramirez-Jacobs, M.D., and Dyan Hampton-Aytch, Ph.D., state that Tuskey's conditions would cause her to miss work or be off-task.  *See* ECF No. 15-3, PageID.113-118; ECF No. 15-9, PageID.583-585.

Tuskey contends that these medical sources never stated she would *not* miss work or be off-task because of her symptoms.  But Tuskey carries the burden of adducing evidence showing a more restrictive RFC.  *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  She has not done so.  In support of Tuskey's position that she would miss work and be off-task 60% of the time, she relies only on her own testimony.  The ALJ found Tuskey's testimony conflicted with the evidence described above, and that finding is supported by substantial evidence.

17

Tuskey cites *Ealy v. Commissioner of Social Security*, but that decision does not help her.  *See* 594 F.3d 504 (6th Cir. 2010).  In *Ealy*, the ALJ erred by relying on a medical opinion about the plaintiff's mental RFC but failing to include in the hypothetical all limitations specified by that source.  *Id.* at 516-17.  In contrast, Tuskey does not identify any medical opinions finding that she would miss work or be off-task.  Nor did the ALJ acknowledge any "moderate limitations" but exclude them from the RFC and hypothetical.  Rather, the ALJ found that while Tuskey had a "medically determinable impairment [that] could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence."  ECF No. 15-2, PageID.77.  And that finding was supported by substantial evidence.

The hypothetical posed to the VE was also adequate.  An ALJ does not err by relying on a VE's response to a hypothetical question if the hypothetical accurately represents the claimant's RFC.  *Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp. 2d 739, 744 (W.D. Mich. 2007).  And "a hypothetical question to a VE need not include unsubstantiated complaints."  *Id.* (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

18

Here, the hypothetical matched the limitations in the RFC.  *Compare* ECF No. 15-2, PageID.76 *with id.* at PageID.102.  Tuskey contends that the ALJ misspoke in another hypothetical by asking whether a person with the described limitations could perform any jobs in the national economy if she "would be absent more than two months [sic] per month on a continuing basis."  *See* ECF No. 15-2, PageID.103.  That hypothetical is irrelevant; the ALJ rejected it and used the first hypothetical in his RFC. Thus, Tuskey's argument provides no basis for disturbing the Commissioner's decision.

## IV.   Conclusion

The Court **RECOMMENDS** that Tuskey's motion for summary judgment (ECF No. 17) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 19) be **GRANTED**, and the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: April 11, 2022

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*.*  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 11, 2022.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager