UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CARA E. TUSKEY,<br><br>    Plaintiff,<br><br>v.<br><br>SOCIAL SECURITY COMMISSIONER,<br><br>    Defendant. | Case No. 21-10157<br>Honorable Laurie J. Michelson<br>Magistrate Judge Elizabeth A. Stafford |

**OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION [21], DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [17], AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19]**

In July 2017, 24-year-old Cara Tuskey applied for social security benefits. Tuskey's application was based primarily on gastroparesis, sinus tachycardia, sleep apnea, and migraine headaches. Gastroparesis is a condition where the stomach takes longer to empty. (PageID.400.)[1] For Tuskey, this caused nausea and constipation; medication and a special diet improved—but did not completely resolve—these symptoms. (*See* PageID.577, 802, 1070, 1103, 1375.) Perhaps partly due to genetics and perhaps partly due to gastroparesis, Tuskey, who is 5'2" tall, weighed around 95 pounds at times during the disability period (July 2017 to December 2019). (*See e.g.*, PageID.1165 (noting that Tuskey was "very limited" in her physical activity and that her weight had dropped from 110 pounds to "the low 90s").)

---

[1] Unless otherwise indicated, all record citations are to the administrative record, ECF No. 15.

Tuskey's tachycardia caused lightheadedness. (PageID.483, 500–501, 681, 901, 913.) She received medication for her tachycardia (PageID.901), but it proved ineffective (PageID.436); Tuskey was thus advised to stop taking medication and hydrate, exercise, and wear compression stockings (PageID.436). As for Tuskey's sleep apnea, an APAP machine helped significantly. (*See* PageID.331, 477, 511.) Still, perhaps due to the combination of her health conditions, Tuskey slept more than normal during the disability period. (*See* PageID.1184.) Finally, Tuskey also sought disability based on migraine headaches. Despite trials of numerous medications, Tuskey experienced between one and four severe migraines a month during the disability period. (*See* PageID.1061, PageID.1202, PageID.1226 (noting headaches at "8/10" pain).) Doctors suspected that autonomic dysfunction explained Tuskey's various conditions, but extensive testing at the Mayo Clinic appears to have ruled out that possibility. (*See* PageID.550, 1167, 1427, 1467.)

After the Social Security Administration denied Tuskey's application at the initial review level, Tuskey sought further review by an administrative law judge. (PageID.107.) Consistent with the social security regulations, the ALJ formulated a residual-functional-capacity assessment—a description of what Tuskey could still do despite her impairments. The ALJ found that Tuskey had the residual functional capacity to perform "light work" (a defined term) but with additional limitations (e.g., no exposure to extreme temperatures). (PageID.76.) And, according to the testimony of a vocational expert, a person with the ability to perform that type of light work could hold a job as an office cleaner, an assembler at an industrial bench, or a

packager. (PageID.103.) Because there were jobs that Tuskey could perform despite her limitations, the ALJ concluded she was not disabled from the time she filed her application (July 2017) through the date of his decision (December 2019). (PageID.83.)

When the Social Security Administration's Appeals Council denied Tuskey's request to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner of Social Security. (PageID.62.) Believing the ALJ's decision to be error, Tuskey filed this lawsuit against the Commissioner.

Tuskey's and the Commissioner's motions for summary judgment were referred to Magistrate Judge Elizabeth A. Stafford for a report and recommendation. The Magistrate Judge concluded that the Commissioner had the better view, and she recommends granting the Commissioner's motion and denying Tuskey's. (ECF No. 21.) The Magistrate Judge found that "[w]ith treatment, Tuskey's migraines were well controlled," that "Tuskey's gastroparesis and constipation appear well controlled with conservative treatment," and that "Tuskey's tachycardia remained stable and responsive to conservative treatment." (ECF No. 21, PageID.1634, 1635, 1637.)

Tuskey makes a single objection to the report. *See* 28 U.S.C. § 636(b) (providing that a district judge must make a "de novo determination" on the portions of the report objected to). She objects that "[t]he Report and Recommendation is in violation of *Ealy v. Commissioner of Social Security*" and three similar cases. (ECF No. 22, PageID.1644.) In *Ealy*, a physician had limited the claimant's attention span to "[two-hour] segments . . . where speed was not critical" and the ALJ had similarly found

3

moderate difficulties in concentration, persistence, or pace. 594 F.3d 504, 516 & n.4 (6th Cir. 2010). Despite those determinations, the ALJ erroneously omitted corresponding limitations from the residual-functional-capacity assessment provided to the vocational expert. *See id.* The other three cases cited by Tuskey are similar. *See Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842 (E.D. Mich. 2007) (remanding where ALJ found that the claimant had a "moderate deficiency in her ability to maintain concentration, persistence," but the ALJ's residual-functional-capacity assessment merely limited the claimant to "simple, routine, repetitive work"); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930–31 (E.D. Mich. 2005) (similar); *Thomczek v. Chater*, No. 94-74011, 1996 WL 426247, at *2–3 (E.D. Mich. Jan. 5, 1996) (similar).

Tuskey says this case is just like *Ealy*, *Benton*, *Edwards*, and *Thomczek*. (*See* ECF No. 22, PageID.1646–1647.) At the hearing before the ALJ, Tuskey's attorney asked her, "in the course of your experience with . . . your multiple symptoms, a[n] . . . eight-hour a day, five days a week, . . . what percentage of your time do you think you'd be . . . 'off-task' and not be able to participate in a job[?]" (PageID.96.) Tuskey answered, "Probably 60 percent." (PageID.96.) In his disability decision, the ALJ made note of this testimony: "[The claimant testified that] [s]he cannot participate in normal activities 60% of the time." (PageID.77.) Then, a couple sentences later, the ALJ stated that while the evidence could support the symptoms that Tuskey had testified about, her "statements concerning the intensity, persistence and limiting effects of these symptoms are *not entirely consistent* with the medical evidence and

4

other evidence." (PageID.77 (emphasis added).) Tuskey argues that because the ALJ found that her testimony about being off task 60 percent of the time was not "entirely" consistent with evidence, the ALJ impliedly found that she would be off task some percentage less than 60 but more than zero. (ECF No. 22, PageID.1644–1645.) Yet, argues Tuskey, the residual-functional-capacity assessment provided to the vocational expert did not include a limitation for off-task time. (ECF No. 22, PageID.1646–1647.) Thus, Tuskey says that this case is like *Ealy*, *Benton*, *Edwards*, and *Thomczek* where the ALJ found that the claimant had a functional limitation but omitted that limitation when eliciting testimony from the vocational expert. (*See* ECF No. 22, PageID.1645–1648.)

A more complete recitation of the ALJ's decision shows why this objection falls short. In what covers almost a full page of single-spaced text, the ALJ summarized what Tuskey had said at the hearing and in her self-completed function report. (PageID.76–77.) As examples, the ALJ noted that Tuskey had reported feeling "tired even with 10 hours of sleep," needing "naps on days when she had bad pain," needing to "rest for five to 30 minutes" if "her heart rate went up while walking," and being unable to "walk or climb stairs without her heart rate spiking and becoming short of breath." (*Id.*) Among the list of Tuskey's statements that the ALJ recounted was her statement about being off-task 60 percent of this time. Then, after recounting Tuskey's statements about her symptoms and limitations, the ALJ used standard, form language: "After careful consideration of the evidence, the undersigned finds that Claimant's medically determinable impairments could reasonably be expected

5

to cause the alleged symptoms; however, Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (PageID.77.)

With that more complete description of the ALJ's narrative, it becomes apparent that the ALJ's "not entirely consistent" statement is simply too vague to permit the inference that Tuskey draws. The ALJ's "not entirely consistent" remark could be referring to any number of Tuskey's statements—there is no way to say with any certainty that it was her statement about being off-task 60 percent of the time. And while Tuskey infers that the ALJ's use of "not entirely consistent" meant that he was crediting her statement in part, it could also mean that he was crediting some of her statements in full and rejecting others in full. But whatever the ALJ meant, the bottom line is that it is difficult, if not impossible, to infer that the ALJ was homing in on Tuskey's statement about off-task time and crediting that statement in part. Accordingly, this is not a situation where, on the one hand, the ALJ found that the claimant had a limitation but, on the other hand, omitted that limitation from the residual-functional-capacity assessment provided to the vocational expert. In other words, this case does not present the situation in *Ealy*, *Benton*, *Edwards*, and *Thomczek*.

Other than trying to shoehorn her case into the rule of *Ealy*, *Benton*, *Edwards*, and *Thomczek*, Tuskey makes no other objection to the report and recommendation.

6

Tuskey does make the following cursory statement: "the medical records are consistent with . . . being 'off task' a percentage of time." (ECF No. 22, PageID.1646.) But apart from summarizing opinions by physicians—none of whom opined on off-task time or work absences—Tuskey makes no effort to show how the medical evidence is (as she claims) "consistent with . . . being 'off task' a percentage of time." And that failure is problematic given that the report and recommendation quite thoroughly discussed the medical records and concluded that "[w]ith treatment, Tuskey's migraines were well controlled," that "Tuskey's gastroparesis and constipation appear well controlled with conservative treatment," and that "Tuskey's tachycardia remained stable and responsive to conservative treatment." (ECF No. 21, PageID.1634, 1635, 1637.) Given these findings by the Magistrate Judge, Tuskey needed to do more to make a proper objection about the medical evidence supporting an off-task limitation. *See Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001) ("The filing of vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object.").

And even if this Court were to consider Tuskey's argument that the medical evidence shows that the residual-functional-capacity assessment was error, the Court would not remand this case for further proceedings. If the Court were crafting the residual-functional-capacity assessment in the first instance, it might well have included some type of limitation for off-task time or work absences. But that is not this Court's role. This Court's role is limited to determining if the residual-functional-capacity assessment that the ALJ crafted is supported by substantial evidence. *See*

7

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). In other words, the Court need only answer this question: based on the entire record, was it reasonable to omit off-task and work-absence limitations from the residual-functional-capacity assessment? *See id.* ("Substantial evidence consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks omitted)). The answer is "yes."

Consider Tuskey's migraines first. To be sure, during the disability period, Tuskey's migraines never resolved completely; in fact, she suffered severe migraines throughout the disability period. But, as the Magistrate Judge suggested, there is substantial evidence that Tuskey's migraines were controlled enough for her to perform a sedentary, unskilled job. (The ALJ limited Tuskey to a restricted range of *light*, unskilled work but the vocational expert testified that there would also be sedentary jobs with the same restrictions. (PageID.103.)) In November 2017, although Tuskey reported more frequent migraines during the prior month, she also reported "good relief from the headaches for about 3.5 months." (PageID.556.) A June 2018 treatment note states, "Before Botox for headaches for 15 to 20 days per month. After Botox they have been 10 to 15 days per month." (PageID.1163.) A December 2018 treatment note indicates Tuskey's migraines were "currently well controlled" with a frequency of about one a week. (PageID.1432.) And a treatment note from May 2019 provides, "She had minimal headaches through the last 3 months and she has had a few weeks without any headaches." (PageID.1555.) True, in September 2019, Tuskey reported an increase in migraines; but she also attributed the increase to the

8

summer heat, and her doctor prescribed a new medication. (PageID.1578.) Further, the ALJ included some limitations in his residual-functional-capacity assessment to account for some of Tuskey's migraine triggers: "cannot work with concentrated extreme temperatures, pulmonary irritants, or hazards, such as moving machinery." (PageID.76.)

The evidence suggesting that Tuskey's migraines improved, along with the job limitations to account for some of Tuskey's triggers, makes this case similar to others where courts have found substantial evidence supporting the ALJ's decision. *Christina L. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-00505, 2022 WL 2913871, at *4–5 (S.D. Ohio July 25, 2022) (rejecting claim that "persistent nonintractable migraine headaches" would "contribute to being off-task or needing to leave work early" where claimant "generally experienced improvement with treatment"); *Charvat v. Comm'r of Soc. Sec.*, No. 1:20-CV-1608, 2021 WL 3633478, at *9 (N.D. Ohio Aug. 17, 2021) (rejecting claim that the residual-functional-capacity assessment should include two to three absences per week due to migraines where "treatments helped her condition stabilize").

There is also substantial evidence that Tuskey's nausea, constipation, and abdominal pain would not result in significant off-task time or work absences. In June 2017, a treatment note indicated that Tuskey had been drinking "64 ounces of fluid a day" and "grazing throughout the day and has been tolerating food well." (PageID.530.) A note from March 2018 states, "She is able to tolerate pasta, rice, chicken, mashed potatoes. She is not able to tolerate red meat. She has been able to

9

eat more in one sitting with the increased dose of domperidone." (PageID.1175.) And a May 2018 treatment note indicates that Tuskey's gastrointestinal nausea and pain had improved with medication, that her nausea was "intermittent," that she was having two episodes of sharp abdominal pain per month. (PageID.1038.) True, Tuskey was still only having one bowel movement per week. (*Id.*) But it appears that after being evaluated at the Mayo Clinic in May 2018, Tuskey began taking Miralax on a daily basis. (*See* PageID.1162.) And a treatment note from November 2018, indicates "Normally takes daily miralax and gets 1 [bowel movement per] day." (PageID.1375.) Although Tuskey's constipation worsened in November 2018, she also noted, "I had also started Solumedrol infusions around the time the constipation got worse." (PageID.1413; *see also* PageID.1430, PageID.1545.)

(It appears that the Solu-Medrol injections were an attempt to treat several of Tuskey's conditions at once. After 12 weeks of injections, she indicated that "overall she felt better," "that she was able to keep weight on," and that she weighed around 100 pounds. (PageID.1545; *see also* PageID.1550 (suggesting that Solu-Medrol helped with gastric emptying).))

Finally, the evidence of Tuskey's tachycardia, lightheadedness, presyncope sensations, and fatigue does not show that the ALJ erred in omitting off-task time or work absences from the residual-functional-capacity assessment. A treatment note from February 2017 indicates that Tuskey had been recommended only "conservative management" for sinus tachycardia. (PageID.498.) True, an April 2018 note provides that Tuskey was feeling weaker and that with exertion and caffeine, she was

experiencing heart palpations at about 140 beats per minute. (PageID.1181.) But that same note also indicates that Tuskey usually did not experience dizziness and had no syncopal episodes. (*Id.*) Tuskey points to no records relating to her heart condition or blood pressure that strongly show the need for off-task or work-absence limitations at a sedentary job.

In short, Tuskey's objection is based on *Ealy* and like cases; but even if the Court were to look further, she has not shown that the ALJ's decision to omit off-work-time and work-absence limitations from the residual-functional-capacity assessment lacks substantial evidentiary support. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

* * *

For the reasons given, the Court ADOPTS the Magistrate Judge's report and recommendation (ECF No. 21), GRANTS the Commissioner's motion for summary judgment (ECF No. 19), and DENIES Tuskey's motion for summary judgment (ECF No. 17).

SO ORDERED.

Dated: September 1, 2022

                                             s/Laurie J. Michelson
                                             LAURIE J. MICHELSON
                                             UNITED STATES DISTRICT JUDGE